FEDERAL TRADE COMMISSION,
Plaintiff,

v.

SWEDISH MATCH, et al., Defendant.

No. CIV. 00–1501(TFH).

United States District Court,
District of Columbia.

Dec. 14, 2000.

Richard Liebeskind, Rhett R. Krulla, Steven L. Wilensky, Bureau of Competition, F.T.C., John D. Graubert, Federal Trade Commission, Office of General Council, Washington, DC, for Plaintiff.

E. Marcellus Williamson, Latham & Watkins, Washington, DC, James V. Kearney, Latham & Watkins, Peter Gruenberger, Weil, Gotshal & Manges, LLP, New York City, for Defendants.

### REDACTED MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Pending before the Court is the Federal Trade Commission's ("FTC" or "Commission") motion for preliminary injunction pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b). The Commission seeks to enjoin the acquisition by Swedish Match North America, Inc. ("Swedish Match") of the loose leaf chewing tobacco business of National Tobacco Company, L.P. ("National"). This injunction is sought to maintain the status

quo pending final disposition before the FTC of administrative proceedings to determine whether such acquisition may substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. The proposed acquisition has been postponed by agreement of the parties, pending the Court's resolution of this motion. After thorough consideration of the parties' briefs, the exhibits presented by the parties before and during the five-day hearing held in this matter, each witness's credibility, and each party's proposed findings of fact and conclusions of law, and for the reasons set forth below, the Court will grant the plaintiff's motion.[1] This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.

## I. BACKGROUND

The FTC is an administrative agency of the United States organized and existing pursuant to the Federal Trade Commission Act, 15 U.S.C. §§ 41–77. The Commission is responsible, *inter alia*, for enforcing federal antitrust laws, particularly Section 7 of the Clayton Act, and Sections 5 and 13(b) of the Federal Trade Commission Act.

Swedish Match is a corporation organized and existing under the laws of Delaware, with its principal place of business in Virginia. Swedish Match is a wholly owned subsidiary of Swedish Match AB, a foreign corporation headquartered in Stockholm, Sweden.[2] Swedish Match manufactures and sells primarily loose leaf and moist snuff tobacco. It produces loose leaf and moist stuff tobacco at its plant in Owensboro, Kentucky. Swedish Match is the largest producer of loose leaf tobacco in the United States. In 1999, its loose leaf sales totaled $127 million, which constituted forty-two percent of all loose leaf sales. Swedish Match's loose leaf brands include Red Man, Red Man Golden Blend, Red Man Select, Southern Pride, J.D.'s Blend, Granger Select, Work Horse, Union Standard, Pay Car, and Red Horse. Red Man, a premium brand, is Swedish Match's leading brand of loose leaf tobacco. In 1999, Red Man had a twenty-two percent share of the loose leaf market. And together, Red Man, Red Man Golden Blend, and Red Man Select accounted for thirty-six percent of all loose leaf sales by revenue. Swedish Match is also the third largest producer of moist snuff tobacco in the United States. In 1999, its moist snuff sales totaled $54 million, which constituted three percent of all moist snuff sales. Its moist snuff brands include Timber Wolf and Renegades. Timber Wolf comes in several cuts, including natural Fine Cut, Wintergreen Long Cut, Wintergreen Cool, Wintergreen Fine Cut, and Long Cut Straight. Timber Wolf, a price-value (or everyday low price ("EDLP")) brand, is

1. The Commission's action in this case appears anomalous when juxtaposed to other government efforts respecting tobacco sales in the United States. In recent years, the government has made every effort to stem the consumption of tobacco by the public. The government specifically has sought to discourage consumption by increasing the prices of tobacco products through taxes, regulating tobacco advertising, and decreasing the amount of shelf space devoted to tobacco products at stores. Here, by contrast, the FTC has vigorously and successfully opposed an acquisition of a chewing tobacco product on the basis that it will result in anticompetitive effects and price increases. This effort by the government therefore appears to be incoherent with its other efforts respecting tobac-

co. At the same time, the Court appreciates the Commission's explanation that if the acquisition is permitted then consumption of loose leaf will not decline. Rather, consumers will simply be paying more for that consumption. And even if the defendants were correct on their arguments that significant substitution would result, consumption would merely switch from loose leaf to moist snuff. Thus, there is ultimately no public health benefit to permitting the acquisition.

2. Swedish Match AB produces loose leaf tobacco, moist snuff tobacco, cigars, pipe tobacco, matches, and disposable lighters. In 1999, the parent company had sales totaling approximately $1 billion in 140 countries.

Swedish Match's leading moist snuff brand.

National is a limited partnership organized and existing under the laws of Delaware, with its principal place of business in New York. It is a wholly owned subsidiary of North Atlantic Trading Company, Inc., which is headquartered in New York City. National primarily manufactures and sells loose leaf chewing tobacco and is the third largest producer of loose leaf chewing tobacco in the United States. In 1999, its sales totaled $53 million, which constituted an eighteen percent share of the loose leaf market. National produces several brands of loose leaf chewing tobacco including Beech–Nut, Beech–Nut Wintergreen, Havana Blossom, Trophy, and Durango. Beech–Nut, a premium brand, is National's leading loose leaf brand. In 1999, Beech Nut Regular and Beech–Nut Wintergreen comprised thirteen percent of loose leaf sales. National produces its loose leaf chewing tobacco brands at its Louisville, Kentucky plant.

Other producers in the loose leaf and moist snuff markets, while not directly involved in this litigation, include Conwood Corporation ("Conwood"), Swisher International, Inc. ("Swisher"), Fred Stoker & Sons, Inc. ("Fred Stoker"), and U.S. Tobacco ("UST"). Conwood produces Levi Garrett, the second largest selling loose leaf brand. Swisher produces Lancaster and Chattanooga Chew, which are respectively the eighth and ninth leading brands of loose leaf tobacco. Fred Stoker's loose leaf brands account for approximately one percent of all loose leaf. UST is the leading producer of premium moist snuff brands, including the largest selling brand, Skoal. UST accounts for more than seventy-five percent of moist snuff sales and approximately forty percent of total smokeless tobacco sales.

In 1997, Swedish Match and National unsuccessfully attempted to solidify a joint operation agreement, under which Swedish Match would manufacture National's brands in its Owensboro facility.[3] In 1999, however, Swedish Match and National came to the table again, this time discussing an asset purchase arrangement rather than a joint operation agreement. On February 10, 2000, they entered into an asset purchase agreement under which Swedish Match would acquire the loose leaf tobacco brands and certain related assets of National for approximately $165 million. According to the defendants, the purpose of this asset purchase agreement is to utilize better Swedish Match's significant and increasing excess capacity. National seeks to alleviate the difficulties created by its own excess capacity and inability to compete with U.S. Tobacco—the leading moist snuff producer—in an environment of declining moist snuff prices.

Pursuant to the Hart–Scott–Rodino Improvements Act of 1976, 15 U.S.C. § 18a, Swedish Match and National filed Premerger Notification and Report forms with the FTC on February 18, 2000. By a vote of 5–0 on June 22, 2000, the FTC authorized its staff to seek a temporary restraining order or preliminary injunction to prevent this merger under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b). The defendants subsequently agreed that they would not effectuate the asset purchase agreement during the pendency of the preliminary injunction proceedings, obviating the need for a temporary restraining order. The FTC filed this suit on June 23, 2000, seeking a preliminary injunction against the merger pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), pending the completion of an administrative proceeding pursuant to Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 12, 21.

**3.** The Court particularly notes with respect to this fact that nothing in the holding today affects the parties' ability to proceed with their original joint manufacturing arrangement, should they wish to reconsider it.

The Court held a five-day evidentiary hearing beginning on September 5, 2000, and closing arguments were heard on September 27, 2000. At the hearing, the FTC called several witnesses, including six industry witnesses and two economic experts, Dr. John Simpson and Dr. Orley Ashenfelter. The defendants offered testimony from several witnesses, also including two economic experts, Dr. Lawrence Wu and Dr. Kenneth Train. In addition to these witnesses, the plaintiff and the defendants have submitted several hundred exhibits.

## II. DISCUSSION

Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits a corporation from acquiring "the whole or any part of the assets of another [corporation] engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." The FTC is authorized by Section 13(b) of the Federal Trade Commission Act to seek a preliminary injunction to block an acquisition pending a full administrative proceeding before the Commission when the Commission has reason to believe that a corporation is violating, or is about to violate, Section 7 of the Clayton Act. 15 U.S.C. § 53(b).

Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), authorizes the Court to grant injunctive relief to the Commission if it finds "[u]pon a proper showing that, weighing the equities and considering the FTC's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond." In other words, to obtain a preliminary injunction under Section 13(b), the FTC must demonstrate: (1) a likelihood of success on the merits in its case under Section 7 of the Clayton Act;

and (2) the equities weigh in favor of granting an injunction. *See FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1080–83 (D.C.Cir.1981); *FTC v. Cardinal Health, Inc.*, 12 F.Supp.2d 34, 44 (D.D.C.1998); *FTC v. Staples, Inc.*, 970 F.Supp. 1066, 1070 (D.D.C.1997); *see also FTC v. Freeman Hospital*, 69 F.3d 260, 267 (8th Cir. 1995); *FTC v. University Health, Inc.*, 938 F.2d 1206, 1217–18 (11th Cir.1991); *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1160 (9th Cir.1984).

### A. Likelihood of Success on the Merits

■ To meet the first requirement—to show a likelihood of success on the merits the Commission must demonstrate the likelihood that it will succeed in proving, after a full administrative trial on the merits, that the effect of Swedish Match's acquisition of National's loose leaf brands "may be substantially to lessen competition, or to tend to create a monopoly" in violation of Section 7 of the Clayton Act. 15 U.S.C. § 18. This does not mean that the Commission must prove at this stage that the proposed merger would in fact violate Section 7 of the Clayton Act. *See Cardinal Health*, 12 F.Supp.2d at 45; *Staples*, 970 F.Supp. at 1070–71; *FTC v. Alliant Techsystems, Inc.*, 808 F.Supp. 9, 19 (D.D.C.1992). Rather, "[t]he determination of whether the acquisition actually violates the antitrust laws is reserved for the Commission and is, therefore, not before this Court." *Staples*, 970 F.Supp. at 1071; *see Cardinal Health*, 12 F.Supp.2d at 45; *Alliant*, 808 F.Supp. at 19. The question before this Court is whether the FTC has made a showing that " 'raises questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the Commission in the first instance and ultimately by the Court of Appeals.' " *Staples*, 970 F.Supp. at 1071 (quoting *FTC v. University Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir.1991); *FTC v. Warner Communications, Inc.*, 742

F.2d 1156, 1162 (9th Cir.1984); *FTC v. National Tea Co.*, 603 F.2d 694, 698 (8th Cir.1979); *Staples*, 970 F.Supp. at 1071; *FTC v. Alliant Techsystems Inc.*, 808 F.Supp. 9, 19 (D.D.C.1992)). Under this standard, it is insufficient for the Commission to show merely that it has a "fair and tenable chance" of ultimate success on the merits. Rather, the Commission must show that there is a "reasonable probability" that the challenged acquisition will substantially lessen competition. *FTC v. University Health*, 938 F.2d 1206, 1218 (11th Cir.1991) ("[T]he government must show a reasonable probability that the proposed transaction would substantially lessen competition in the future."); *Fruehauf Corp. v. FTC*, 603 F.2d 345, 351 (2d Cir.1979) ("There must be 'the reasonable probability' of a substantial impairment of competition to render a merger illegal."); *Cardinal Health*, 12 F.Supp.2d at 45 ("While some would dispute what this standard means, it is well settled in the case law that for the government to succeed, it 'must show a reasonable probability that the proposed transaction would substantially lessen competition in the future.'"); *Staples*, 970 F.Supp. at 1072 ("[I]n a suit for a preliminary injunction, the government need only show that there is a 'reasonable probability' that the challenged transaction will substantially impair competition.").

In order to determine whether the FTC has met its burden with respect to showing its likelihood of success on the merits, the Court must consider the likely competitive effects of the merger. Analysis of the likely competitive effects of a merger requires determinations of (1) the "line of commerce" or product market in which to assess the transaction; (2) the "section of the country" or geographic market in which to assess the transaction; and (3) the transaction's probable effect on competition in the product and geographic markets. *See United States v. Marine Bancorporation*, 418 U.S. 602, 618–23, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); *FTC v. Harbour Group Investments, L.P.*, 1990 WL 198819, 1990–2 Trade Cas. (CCH) ¶ 69,247 at 64,914 n. 3 (D.D.C.1990). *See, e.g., Cardinal Health*, 12 F.Supp.2d at 45; *Staples*, 970 F.Supp. at 1072.

## 1. The Relevant Product Market

Merger analysis begins with defining the relevant product market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). "Defining the relevant market is critical in an antitrust case because the legality of the proposed mergers in question almost always depends upon the market power of the parties involved." *Cardinal Health*, 12 F.Supp.2d at 45. Not only is the proper definition of the relevant product market the first step in this case, it is also the key to the ultimate resolution of this type of case because of the relative implications of market power. *See, e.g., Staples*, 970 F.Supp. at 1073 ("As with many antitrust cases, the definition of the relevant product market in this case is crucial. In fact, to a great extent, this case hinges on the proper definition of the relevant product market."). The Commission argues that loose leaf tobacco constitutes a distinct relevant product market, which does not include moist snuff. Under this narrower view of the market, the acquisition in this case would create a combined entity consisting of the first and third largest sellers of loose leaf tobacco that would be twice as large as its nearest competitor and would control sixty percent of all loose leaf sales. Moreover, the top two firms in the loose leaf market would control over ninety percent of the market. Thus defined, as is discussed in greater detail below, a significant hurdle is erected before the defendants to show that such increased concentration of the market will not likely result in substantial impairment of competition. Swedish Match and National rejoin that the relevant market is a broader, smokeless tobacco market, which includes moist snuff as well as loose leaf tobacco. Under their view, the concentration of the smokeless tobacco market and

any increase to it caused by this acquisition are minimal. This view rests upon the premise that companies such as UST, who dominates the moist snuff industry, are vibrant competitors with significant market power. After careful review of the evidence presented in this case and its relative merit, the Court finds the relevant product market in this case to be, as the Commission contends, loose leaf chewing tobacco.

The Supreme Court has articulated the general rule for determining a relevant product market: "The outer boundaries of a product market are determined by the reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. 1502; *see also United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Interchangeability of use and cross-elasticity of demand look to the availability of products that are similar in character or use to the product in question and the degree to which buyers are willing to substitute those similar products for the product. *See E.I. du Pont de Nemours,* 351 U.S. at 393, 76 S.Ct. 994; *see also Hayden Pub. Co. v. Cox Broadcasting Corp.,* 730 F.2d 64, 70 n. 8 (2d Cir.1984) (framing the question as "whether two products can be used for the same purpose, and, if so, whether and to what extent purchasers are willing to substitute one for the other"). The Court must determine whether moist snuff is similar in character or use to loose leaf, and if so, whether sufficient moist snuff substitution occurs to defeat loose leaf price increases. If moist snuff is sufficiently similar to loose leaf that it induces adequate substitution to defeat loose leaf prices increases, then it should be included in the relevant product market, because of its ability to constrain prices and maintain a competitive marketplace. *See, e.g., Cardinal Health,* 12 F.Supp.2d at 46 ("In other words, when one product is a reasonable substitute for the other, it is to be included

in the same relevant product market even though the products themselves are not the same. A product is construed to be a 'reasonable substitute for another when the demand for it increases in response to an increase in the price for the other.' ").

Whether moist snuff tobacco is similar in character or use to loose leaf tobacco may be termed "functional interchangeability." *See, e.g., E.I. du Pont de Nemours,* 351 U.S. at 399, 76 S.Ct. 994 (recognizing "functional interchangeability" between cellophane and other flexible wrappings); *United States v. Archer–Daniels–Midland Co.,* 866 F.2d 242, 246 (8th Cir.1988) (discussing "functional interchangeability" between sugar and high fructose corn syrup). The Commission argues here that loose leaf and moist snuff are not functionally interchangeable. Under its view, the products have distinct characteristics ranging from packaging, price, and consumption to taste, texture, and tobacco plant composition. Loose leaf tobacco is sold in three-ounce pouches, while moist snuff is sold in smaller, 1.2–ounce round plastic containers. Users consume loose leaf by chewing and manipulating the tobacco leaves to extract the flavor, while moist snuff users place "a pinch" of snuff between the gums and cheek, passively absorbing the flavor and nicotine into the mouth. Users chew loose leaf primarily outdoors because of the need to spit frequently, while users consume moist snuff indoors as well as outdoors. Loose leaf is less expensive than moist snuff. While premium loose leaf retails at a mean price of $1.95, premium moist snuff retails at a mean price of $3.50. Loose leaf has a distinct customer base. Loose leaf users are typically older, blue-collar males who live in rural areas in the southeastern United States, while moist snuff users are younger white-collar as well as blue-collar individuals who are more evenly dispersed through the United States.

The defendants counter that loose leaf and moist snuff are reasonably interchangeable because they are similar products, used largely for the same purposes, and any purported differences are merely superficial. Both forms of tobacco are smokeless and consumed through the mouth to extract tobacco flavor and nicotine. And both forms of tobacco yield what consumers call "tobacco satisfaction." Users consume one can of moist snuff at about the same rate as consumers use one pouch of loose leaf tobacco. Loose leaf and moist snuff are sold in the same convenience stores, gas stations, large retail chains, supermarkets, discount outlets, and specialty tobacco shops. Loose leaf and moist snuff generally share the same customers, who tend to be white, blue-collar males, often fishers and hunters. Many smokeless tobacco consumers not surprisingly are therefore "dual users"; that is, they use loose leaf and moist snuff interchangeably.

The Court finds loose leaf and moist snuff to be functionally interchangeable. The determination of functional interchangeability depends to some degree upon the level of generality used to evaluate the products at issue in cases such as this. On one hand, the Commission is correct that at a more specific level loose leaf and moist snuff are not identical. There are differences between loose leaf and moist snuff that are not merely superficial including, *inter alia,* the tobacco plant varieties used to produce each product, the different additives used in their production, and the different packaging utilized in their distribution. More important, consumers consistently report specific differences in texture and taste between them. At a more general level, on the other hand, loose leaf and moist snuff share a smokeless tobacco form, are consumed through absorption within the user's mouth, require frequent spitting, and yield tobacco satisfaction. And despite specific differences in taste, there is no doubt that at least some consumers are willing to use both loose leaf and moist snuff, as is evidenced by the rising population of dual users.[4] Thus, while loose leaf and moist snuff tobacco are not identical, in light of substantial similarities between them and in light of the rising trend in dual usage by consumers, the Court ultimately finds the products to be functionally interchangeable for the purpose of outlining the relevant product market.

■ Finding two products to be functionally interchangeable, however, does not end the analysis. The Supreme Court did not stop after finding a high degree of functional interchangeability between cellophane and other wrapping materials in the *E.I. du Pont de Nemours* case. Instead, the Court also found that "an element for consideration as to cross-elasticity of demand between products is the responsiveness of the sales of one product to price changes of the other."

---

4. A 1996 ICR Loose Leaf Chewing Tobacco Attitude and Usage Study measured dual usage at thirty-seven percent. *See* DX 807. Another study of 1509 respondents conducted by Rose Research in 1999 reported that forty-four percent of the respondents who claimed to be loose leaf users also used moist snuff. *See* DX 214. Together, these studies evidence the increase of dual usage in recent years. This is particularly compelling in light of the fact that an even greater percentage of younger users of loose leaf also use moist snuff. The 1999 Rose Research study showed that eighty-one percent of the loose leaf users ages eighteen to thirty-four reported also consuming moist snuff. *See id.* at 872. Sixty-three percent of the same age group reported using moist snuff most often. *See id.* at 873. The 1996 ICR study found that sixty-four percent of users ages eighteen to thirty-four were dual users. *See* DX 807 at 70. The Commission contests these studies as inaccurate because of the methodology used to obtain the data. It specifically contends that the percentages generated by the surveys depended in great measure upon the question asked, and in the survey relied upon by the defendants, the question that yielded forty-four percent dual usage is equivocal. Nonetheless, the Commission does not dispute that some amount of dual usage exists. As is discussed more fully below, it argues instead that the dual usage is irrelevant for determining price-based substitution.

*E.I. du Pont de Nemours & Co.*, 351 U.S. at 400, 76 S.Ct. 994. The Court explained further that "[i]f a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane, it would be an indication that a high cross-elasticity of demand exists between [cellophane and other flexible wrappings]; [and therefore] that the products compete in the same market." *Id.* Likewise, in *Staples*, the consumable office products at issue were identical and therefore perfectly interchangeable. 970 F.Supp. at 1074. Yet this Court proceeded to an analysis of cross-elasticity and price constraints in defining the relevant market, ultimately finding the sale of consumable office supplies by office superstores to be a sub- · market within a larger market of retailers of office supplies in general. *See id.* at 1074, 1080. As with the wrapping materials in *E.I. du Pont de Nemours* and the consumable office supplies in *Staples*, smokeless tobacco constitutes a broader market in this case, comprised of both loose leaf and moist snuff which at some level compete with one another. But as stated by this Court in *Staples*, "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." 970 F.Supp. at 1075.

The Supreme Court has recognized that within a broad market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502; *see also Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C.Cir.1986), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987). With respect to such submarkets, the Court explained, "[b]ecause Section 7 of the Clayton Act prohibits any merger which may substantially lessen competition 'in any line of commerce,' it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable proba-bility that the merger will substantially lessen competition. If such a probability is found to exist, the merger is proscribed." *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502.

The Court in *Brown Shoe* provided a series of factors or "practical indicia" for determining whether a submarket exists including "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325, 82 S.Ct. 1502. As "practical indicia," these factors are not necessarily criteria to be rigidly applied. *See International Tel. & Tel. Corp. v. General Telephone & Electronics Corp.*, 518 F.2d 913, 932 (9th Cir.1975) (explaining that *Brown Shoe*'s practical indicia were meant as "practical aids ... rather than with the view that their presence or absence would dispose, in talismanic fashion, of the submarket issue"). In fact, subsequent cases have found that submarkets can exist even if only some of these factors are present. *See, e.g., Beatrice Foods Co. v. FTC*, 540 F.2d 303 (7th Cir.1976) (finding submarket based on industry recognition, peculiar characteristics of the product, and differences in production methods and prices). Therefore, as the courts have clarified, the determination of the relevant product market is " 'a matter of business reality ... of how the market is perceived by those who strive for profit in it.' " *Cardinal Health*, 12 F.Supp.2d at 46 (quoting *FTC v. Coca-Cola Co.*, 641 F.Supp. 1128, 1132 (D.D.C. 1986), *vacated as moot*, 829 F.2d 191 (D.C.Cir.1987)).

With respect to *Brown Shoe*'s price sensitivity factor, the evidence shows that substitution to moist snuff is unlikely in the event of a price increase in loose leaf tobacco. While the Commission has been unable to bring forward the same degree and type of pricing evidence the Court

found compelling in *Staples*,[5] it has made an adequate showing that loose leaf is insufficiently price sensitive. One way to evaluate price sensitivity is to apply the U.S. Department of Justice and Federal Trade Commission's Horizontal Merger Guidelines' "hypothetical monopolist" test. U.S. DOJ & FTC, 1992 Horizontal Merger Guidelines § 1.11, 57 Fed.Reg. 41,552, 41,-555–56 (1992) [hereinafter Merger Guidelines]. The test asks whether a sufficient number of consumers would switch to other products in response to a hypothesized small but significant, nontransitory increase in price ("SSNIP") for the products of a hypothetical monopolist consisting of the merging firms and all other firms to which customers would switch. *See id.* In the context of this case, the test specifically asks whether loose leaf users would reduce loose leaf consumption by an amount sufficient to make a five-percent, or ten-cent, increase in price unprofitable. If a five-percent increase in loose leaf prices would induce a sufficient number of users to switch to the proposed substitute, moist snuff tobacco, then moist snuff should be included in the relevant product market. But if a sufficient number of consumers will not substitute moist snuff to make a five-percent increase in loose leaf prices unprofitable, then moist snuff should be excluded from the relevant product market definition.

The Commission's economics expert, Dr. John Simpson, applied this hypothetical monopolist test to this case and has concluded that loose leaf consumers will not reduce loose leaf consumption by substituting moist snuff consumption in an amount sufficient to make a five-percent increase in the price of loose leaf unprofitable. With fifty-five to sixty-five percent margins, which both sides agree exist here, Dr.

Simpson calculated the critical loss—the largest amount of sales that a monopolist can lose before a price increase becomes unprofitable—of a five-percent price increase of loose leaf at approximately seven to eight percent. Using the Lerner Index, which relates margins to elasticity, Dr. Simpson then estimated the demand elasticity for Swedish Match with a price-cost margin of approximately sixty-five percent at an absolute value of approximately 1.67. At this level, a five-percent price increase by Swedish Match on its loose leaf brands would lead to approximately an eight percent decrease in its sales.[6] If all loose leaf producers increase their price by five percent, however, the industry-wide loss of sales will be less than eight percent. This is because it is easier for consumers to switch from one loose leaf brand to another than it is to switch to moist snuff. In other words, the elasticity of demand facing an individual firm in an industry will be greater that the elasticity of demand facing an industry. Dr. Simpson then inferred, after interviewing industry participants and reviewing industry documents, that the industry-wide elasticity will be less than the critical elasticity, and therefore, a five-percent increase by a hypothetical monopolist will be profitable.

In contrast to Dr. Simpson's economic analysis, the defendants proffered Dr. Kenneth Train's econometric analysis that purports to show the true elasticity of demand for loose leaf tobacco as greater than the critical elasticity, rendering a five percent loose leaf price increase unprofitable. After several estimates, Dr. Train ultimately arrived at a loose leaf demand elasticity estimate of 2.17 and a critical elasticity of 1.75. Under his analysis, there is an eighty-five percent probability

5. In *Staples,* the FTC showed that office supply superstores such as Staples set prices thirteen percent higher on average in markets that had no other office supply superstores.

6. This result is confirmed by a 1999 Swedish Match promotion strategy analysis. The analysis approximated that the company would lose thirteen percent of its loose leaf sales if it increased price by eight percent. That approximation is equivalent to Dr. Simpson's estimated eight percent sales loss for a five percent price increase.

that the actual elasticity of loose leaf exceeds the critical elasticity of loose leaf.

The economic evidence in this case, however, is not persuasive.[7] Dr. Simpson's analysis has its limitations. It broadly describes the effects of loose leaf price increases and plausibly extrapolates that the industry demand elasticity is less than the critical elasticity. But Dr. Simpson conceded at the hearing that his inference that the industry-wide elasticity for loose leaf is less than the critical elasticity is subjective, follows no objective methodology, and cannot be proven to any statistical significance. Moreover, Dr. Simpson's use of the Lerner Index in this case is at least questionable. The FTC's own expert, Dr. Orley Ashenfelter, testified at the hearing that if price and quantity data are available, as they are here, he normally would use econometrics, not the Lerner Index, to estimate demand elasticity.[8] The defendant's economics evidence is even less persuasive. The Court simply cannot accept

Dr. Train's econometric analyses as credible. Dr. Train issued several different reports, all of which presented new estimates of the elasticity of demand based on new economic models.[9] Dr. Train admitted that he did not report several estimates of demand elasticity for loose leaf that were less than, as well as greater than, the critical elasticity. And Dr. Train has admitted to relying on other undisclosed estimates to support his ultimate conclusions. The defendants nonetheless ask the Court to rely on an eighty-five percent statistical significance level, or probability, that Dr. Train's ultimate conclusions about the elasticity of demand are correct, even though the experts themselves have not previously relied on this level of confidence.[10] In light of the inconsistent reports and unknown, and therefore untested, bases for Dr. Train's conclusions, the Court is ultimately unwilling to accept Dr. Train's conclusions as credible evidence.

7. The Court is sensitive to the fact that the particular facts and materials of this case may not be amenable to fashioning an accurate economic prism through which one can view the exact outlines of the relevant product market in this case.

8. Despite these technical problems with Dr. Simpson's analysis, however, it does appear implausible that loose leaf users will substitute premium moist snuff in response to a ten-cent increase in price of premium loose leaf, because premium moist snuff would still be approximately $1.40 to 1.45 more expensive. And substitution by loose leaf users to price-value snuff likely would not be a significant constraint not only because price-value volume is small (price-value moist snuff only constitutes approximately 10% of moist snuff sold overall), but also because approximately 78% of price-value moist snuff is sold by loose leaf firms. In other words, it cannot be unprofitable for the hypothetical monopolist to raise the price under such circumstances because the monopolist would only lose a small amount of business in general, and of the lost amount most of it would be coming back because consumers would be substituting one of monopolist's products for another.

9. In his July 28 report, Dr. Train based his estimates upon a model of demand for loose

leaf tobacco that includes as explanatory variables the price of loose leaf tobacco, the price of moist snuff, expenditures on smokeless tobacco, region specific effects, and time specific effects. But as Dr. Train conceded, his estimate of elasticity depended on the order in which the data from different regions, used as instrumental variables, appears in his data base. Other orderings of the data lead to substantially different estimates of the elasticity. In his August 15 report, Dr. Train presented a new elasticity estimate based on a model that includes a lagged dependent variable (quantity sold from the previous period) as an additional explanatory variable and used a new method of implementing Dr. Train's instrumental variables calculation. In September, Dr. Train submitted yet another estimate of the elasticity for loose leaf after running more regressions.

10. While it may be true that there is no bright line between an eighty-five percent statistical significance level and more typically accepted levels of confidence such as ninety-five percent, the defendants have simply not convinced the Court in the totality of the circumstances of this case, which includes Dr. Train's inconsistencies, that it would be appropriate to accept conclusions at this lesser level of confidence. The Court will accordingly refuse their invitation to do so in this case.

Unlike the economic analyses, additional evidence of price sensitivity has been presented in this case that is persuasive. The views of Swedish Match and National competitors, statements by loose leaf distributors, and internal documents of Swedish Match and National show that price-based substitution between loose leaf and moist snuff is generally lacking. Swedish Match competitors believe that there is no switching between loose leaf and moist snuff on the basis of price. Mr. William Rosson, Chairman of Conwood, testified that "people don't switch between loose leaf and moist snuff in our opinion. And we don't advertise to try to cause it to happen, because we think it's a waste of money, either direction." PX 255 at 117. Mr. Thomas Ryan, Senior Vice President of Swisher, similarly testified at the hearing: "I still have no indication that loose-leaf users would switch to moist snuff because of price. They use moist snuff for particular reasons, and they use loose leaf for particular reasons." Both Rosson and Ryan testified at the hearing that they neither consider moist snuff in pricing their loose leaf brands nor alter their loose leaf pricing in response to specific changes in moist snuff prices, such as promotions and discounts.

The Commission also introduced many declarations by loose leaf distributors stating that they do not believe that customers would meaningfully increase moist snuff purchases in response to a five- to ten-percent increase in the price of loose leaf. This belief was echoed by Mr. Larry Pittman, a distributor with Convenience Store Distributing Company. At the hearing, Mr. Pittman testified that a report prepared by his company showed that the respective percentage of total smokeless tobacco sales of moist snuff and loose leaf remained constant when compared before and after a five percent loose leaf price increase. The report shows that in the eyes of distributors consumers do not switch from loose leaf to moist snuff in response to small increases in the price of loose leaf.

Swedish Match and National internal business documents confirm that pricing has little effect on loose leaf demand. [Redacted]. A 1998 Swedish Match survey similarly found:

> Increasing prices of loose leaf tobacco is an issue with the respondents, but it doesn't appear to have reached a critical point. [Consumers] are aware of increasing prices, but their stated sensitivity is, "I don't want to pay that much, but I will to get my preferred brand." The attitude expressed by most is that they will continue to pay increasing prices for their favorite brand rather than switching to a lower price, lesser known brand or a brand that they have tried and rejected. Cessation of usage or reduction of consumption do not appear to be a consideration at this point. Indications are that some now sacrifice convenience to purchase at retailers with lower prices and, if the price is low enough, they purchase cartons instead of pouches to compensate for the inconvenience.

PX 220 at 7449. National's Chairman, Mr. Thomas Helms, stated in a deposition that loose leaf sales cannot be increased by cutting loose leaf prices. Likewise, Mr. William McClure III, President of Pinkerton Tobacco from 1992 to 1997 and Chief Operating Officer of Swedish Match from 1997 to 1999, testified that Swedish Match could not materially increase loose leaf sales by cutting prices.

This general lack of substitution between loose leaf and moist snuff on the basis of price is explained in significant part by the fact that brand loyalty outpaces price as a significant factor in loose leaf consumer buying patterns. As a 1998 Swedish Match survey states it: "Purchase behavior is impacted by price, but price has no impact on brand choice. They will buy a box or a case when they get a good price on their favorite brand but will not switch brand based on price." PX 222 at 1257. Several Swedish Match

documents, including the 1999 Rose Research study, state that most loose leaf consumers are willing to go to another store to buy their favorite brand if the first store does not have it in stock. The 1999 Rose Research study more importantly states that consumers may substitute a significantly lower-priced loose leaf for their primary brand of loose leaf, but not higher priced moist snuff if loose leaf prices increased slightly. The fact that both Swedish Match and National have been unsuccessful in their attempts to introduce moist snuff brands under their popular loose leaf brand names illustrates that moist snuff is not easily substitutable for loose leaf.

Despite all the evidence against price-based substitution, however, dual usage suggests that there are at least some consumers who are willing to switch between loose leaf and moist snuff on the basis of price. Such substitution is facilitated by the fact that there is some degree of price overlap between the prices of loose leaf and moist snuff, particularly with the growth of price-value brands of moist snuff. *See, e.g.,* [Redacted]; DX 917. In 1999, many loose leaf brands had list prices ranging from $0.82 to $1.64 per pouch and a number of moist snuff brands had list prices ranging from $1.10 to $1.67 per can. Market participants have expressed at least some concern with consumer crossover from loose leaf to moist snuff. Mr. McClure testified that Swedish Match attempts to maintain a price gap between loose leaf and moist snuff and that moist snuff prices effectively cap the price of loose leaf. Mr. Ryan similarly admitted that a number of loose leaf users would switch to moist snuff based upon a ten percent price increase in lose leaf. Conwood Current Reviews for years 1998 through 2000 reflect that increased promotional activity on loose leaf will diminish crossover to moist snuff. National reflects that it has long monitored the price of moist snuff relative to the pricing of its loose leaf brands, and its Senior Vice President of Marketing, Mr. Clifford Ray, testi-fied that loose leaf brands are losing sales to price-value moist snuff brands such as UST's Red Seal and Rooster brands. Finally, Dr. Wu testified at the hearing that UST believes the Catalina coupon program, under which loose leaf consumers receive a coupon with each purchase of a loose leaf tobacco pouch that they can use toward a purchase of a moist snuff brand, is successful. As he articulated, UST engages in "very targeted advertising towards loose-leaf users. UST pours a lot of money into this. If UST did not believe that substitution was likely, it's basically wasting its money, and I don't think UST is wasting its money." The defendants introduced evidence showing that the redemption rates on UST's Catalina coupons, while perhaps low in comparison to all products, are in the same range as the redemption rates for Swedish Match's Catalina coupons aimed at inducing substitution from one loose leaf brand to another.

The Commission concedes that dual usage exits, but claims it is wholly irrelevant to price-based substitution. It analogizes the dual usage of loose leaf and moist snuff to drinking Coca–Cola and water. That is, dual usage reflects a desire for variety, depending largely on environmental factors. As Swisher's Mr. Ryan stated at the hearing:

> We never felt that it was price driven. The reason why they would select to use a loose-leaf product versus a moist-snuff product—as I said earlier, I think most of it is situational or [sic] in nature, and if they are working indoors, they might use a moist-snuff product; if they're working outdoors, a loose-leaf product. But it's not really driven by price.

Even if dual usage is relevant to substitution, under the Commission's view, the amount of loose leaf used by dual users is equivocal. At best, it is an small amount that is incapable of defeating a small price increase by loose leaf producers. The Commission offered evidence showing that UST, the leading seller of moist snuff, is

an inadequate price competitor in the loose leaf arena. UST has not aggressively targeted loose leaf users with print advertisements for years. And its Catalina coupon program objectively has been unsuccessful because its coupons have uniquely low redemption rates when compared to average redemption rates of eight to fourteen percent across all products. *See* PX 238. Thus, it is not surprising that loose leaf manufacturers themselves have been unconcerned with UST's efforts to convert loose leaf consumers.

The Court ultimately finds that the limited amount of price-based substitution stemming from moist snuff competition and a rising level of dual usage is insufficient evidence of loose leaf price sensitivity. The Court does not agree with the Commission that dual usage is irrelevant to price sensitivity. Moist snuff competes with loose leaf to a limited degree. It does so not only through promotions such as the Catalina coupon program, but also through price-value brands of moist snuff, the prices for which overlap with the prices of loose leaf at various price points. The rising rate of dual usage evidences this crossover. But there is ultimately an insufficient amount of evidence to convince the Court that moist snuff induces an adequate level of substitution to constrain loose leaf prices. To the contrary, the weight of the evidence demonstrates that moist snuff is incapable of inducing substitution sufficient enough to render loose leaf price increases unprofitable and cannot, therefore, be included in the relevant market on this basis.

Another factor for consideration in determining whether a submarket exists is industry or public recognition of the submarket as a separate economic entity. *See Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502; *Rothery Storage & Van Co. v. Atlas Van Lines*, 792 F.2d 210, 219 (D.C.Cir. 1986) ("The industry or public recognition of the submarket as a separate economic unit matters because we assume that economic actors usually have accurate perceptions of economic realities."). *See, e.g., Staples*, 970 F.Supp. at 1079–80 (finding abundant evidence from office supply superstores' documents that the merging companies focused primarily on competition from other office supply superstores). The Commission introduced many documents showing Swedish Match's and National's recognition of loose leaf as a distinct product market. A 1995 National memorandum states that "[t]he company does not view moist snuff as a direct competitor to its loose leaf chewing tobacco products because of product taste and use differences." PX 129 at 632. [Redacted]. Similar statements have been made in SEC filings by National's parent company, annual reports by Swedish Match, and other various reports, presentations, and memoranda.

Recognition of loose leaf as a distinct product market has also been illustrated through testimony of various loose leaf market participants. Mr. Harold Price, Senior Vice President of Sales and Marketing for Swedish Match, stated that in his eighteen years of experience in the industry, "consumers of moist snuff do not switch to other forms of smokeless tobacco (for example, loose leaf) in response to price increases of moist snuff." PX 200 ¶ 3. Likewise, Mr. McClure testified at the hearing:

> The products are very different. They're used in a different way from chewing tobacco. The consumer taste preferences are different. The demographics of the consumer base are different. You'll find them in a smokeless tobacco section, but they're very distinct product markets. There was some overlap. We had some consumers who would use both products, but for the most part they were separate consumer bases.

Similar statements have been made by other industry participants. Conwood's Mr. Rosson similarly testified at the hearing:

There are two different markets. You have a group of people—basically there are a few that will change—you have the loose-leaf group that likes loose-leaf chewing tobacco. You have the moist snuff user who likes moist snuff. And there are two pretty distinct groups. These products are not similar. They don't taste similar, don't look similar, don't feel similar when you use them. Two different groups. We don't think there is a potential to switch them over from one to the other. Of course, we are happy to tell [sic] one or both of them, but we don't try to switch them.

Swisher's Mr. Ryan stated in a declaration that "[e]very smokeless tobacco company that I have worked for has considered loose leaf chewing tobacco and moist snuff to be distinct products, requiring separate marketing efforts and strategies." PX 204 ¶ 4. Convenience store distributors share this view. Mr. Williams testified at the hearing in this case, "I don't consider them interchangeable. I consider them two separate and distinct products. Now there will be some crossover usage, but to me you are either a chewing tobacco user or you are a moist snuff user."

Distinct pricing is also a consideration in determining whether a submarket exists. *See Brown Shoe,* 370 U.S. at 325, 82 S.Ct. 1502. The Commission amassed evidence showing that loose leaf pricing is determined upon the basis of competition with other loose leaf products, not moist snuff. [Redacted]. Several Swedish Match documents track the price gap between Red Man and price-value loose leaf brands with a policy of not allowing that price gap to exceed thirty percent and that track the price gap between Red Man and Levi Garrett. Other documents show Swedish Match's parallel efforts with respect to its moist snuff products and competition with solely other moist snuff products. Anecdotal evidence also shows that when Swedish Match introduced a new price-value loose leaf brand, Southern Pride, it targeted users of Levi Garret, with no concern

about its own moist snuff brand Timber Wolf. Likewise, when Conwood introduced a new loose leaf brand, Levi Garrett Extra, it specifically targeted loose leaf users. Moreover, the Commission points to the dearth of documents introduced by the defendants to show that moist snuff products are taken into account in competitively pricing loose leaf.

As a further illustration of distinct pricing, significant evidence has demonstrated that prices of loose leaf and moist snuff tobacco move independently of one another. From 1986 to 1997, the price of moist snuff has increased at a rate greater than the price of loose leaf. Swedish Match increased Red Man list prices by six percent in August 1996, four percent in July 1997, six percent in February 1998, three percent in March 1999, and five percent in November 1999. During the same time, Swedish Match increased the price of its moist snuff brand, Timber Wolf, ten percent in December 1996, decreased its price thirty-six percent in July 1997, and increased it again twenty-nine percent in February 1998, eleven percent in October 1998, and ten percent in August 1999. Loose leaf distributors observe no correlation between the pricing of loose leaf and moist snuff, as exemplified through the hearing testimony of Mr. Myron Williams, a wholesale distributor: "[Moist snuff and loose leaf] seem to be independent of one another with regard to price changes. They don't necessarily increase within the same period of time."

For the reasons set forth above, the Court finds that loose leaf chewing tobacco constitutes the relevant product market for the purposes of antitrust analysis. While the Court believes there is some degree of competition between, and overlapping consumer usage of, moist snuff and loose leaf tobacco, the weight of the evidence read in light of *Brown Shoe*'s indicia convinces the Court that loose leaf chewing tobacco constitutes a distinct relevant product market.

## 2. The Geographic Market

The parties do not dispute the relevant geographic market in this case. The Commission, Swedish Match, and National have stipulated that the United States constitutes the relevant geographic market for the Court's analysis of this acquisition.

## 3. Probable Effect on Competition

■ Having defined the relevant product market as loose leaf chewing tobacco sold in the United States, the Court must next consider the likely effects of the proposed acquisition on competition within that market. *See United States v. Marine Bancorporation*, 418 U.S. 602, 618–23, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974). If the FTC can make a prima facie showing that the acquisition in this case will result in a significant market share and an undue increase in concentration within the loose leaf market, a presumption is established that it will substantially lessen competition. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). As the Supreme Court stated in *Philadelphia National Bank:*

> [A] merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

*Id.* at 363, 83 S.Ct. 1715.

The Commission generally can establish a prima facie case by showing that the merged entity will have a significant percentage of the relevant market. *See id.* at 363, 83 S.Ct. 1715; *Cardinal Health*, 12 F.Supp.2d at 51. In *Philadelphia National Bank*, the Court specifically held that a post-merger market share of thirty percent triggers the presumption. 374 U.S. at 364, 83 S.Ct. 1715 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."). *See, e.g., Cardinal Health*, 12 F.Supp.2d at 52–53 (finding eighty percent triggers the presumption). Based on 1999 sales data, Swedish Match had a forty-two percent market share in dollar sales, Conwood had a thirty-three percent market share, National had an eighteen percent market share, Swisher had a six percent market share, and Fred Stoker had a one percent market share. The combined Swedish Match entity will have sixty percent of the loose leaf market after the merger, giving it nearly double its closest competitor, Conwood. And the top two firms left in the market—Swedish Match and Conwood—will have ninety percent of the market.

In addition to market share, courts examine market concentration and its increase as a result of the proposed acquisition. *See Philadelphia Nat'l Bank*, 374 U.S. at 363, 83 S.Ct. 1715; *see also Cardinal Health*, 12 F.Supp.2d at 53; *Staples*, 970 F.Supp. at 1081. If the acquisition is allowed in this case, the level of concentration would increase significantly under the Herfindahl–Hirschman Index ("HHI").[11] According to the Merger Guidelines, any

---

11. As a more accurate measure of market concentration, economists have created and courts have consistently relied upon the HHI. The HHI calculates market power summing the squares of the individual market shares of all the firms in the market. The HHI takes into account the relative size and distribution of the firms in a market, increasing both as the number of firms in the market decreases and as the disparity in size among those firms increases. It has been officially adopted by the government in the Merger Guidelines to measure market concentration. Under the Merger Guidelines, a market with an HHI of less than 1000 is "unconcentrated." An HHI between 1000 and 1800 indicates a "moderately concentrated" market, and any market with an HHI over 1800 qualifies as "highly concentrated." *See FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1503 (D.C.Cir.1986) (citing the Merger Guidelines). Further, according to the Merger Guidelines, unless mitigated by other factors which lead to the conclusion that the merger is not likely to lessen competi-

market with an HHI over 1800 is highly concentrated. *See FTC v. PPG Indus., Inc.,* 798 F.2d 1500, 1503 (D.C.Cir.1986) (citing the Merger Guidelines). And unless mitigated by other factors which lead to the conclusion that the merger is not likely to lessen competition, an increase in the HHI in excess of fifty points in a post-merger, highly concentrated market may raise significant competitive concerns.[12] Although the Supreme Court has established no fixed threshold at which an increase in market concentration triggers the antitrust laws, *see, e.g., Philadelphia Nat'l Bank,* 374 U.S. at 363–65, 83 S.Ct. 1715 (1963), this case does not present a close call. The pre-merger loose leaf market is 3,219, which is highly concentrated. The post-merger HHI would increase to 4,733, which represents an increase of 1,514 points and is well beyond the fifty points designated as a concern under the Merger Guidelines. Because of the market share and concentration levels, the Court finds that the Commission has established a presumption under *Philadelphia National Bank* that Swedish Match's acquisition of National's brands is likely to substantially lessen competition in the loose leaf industry. *See FTC v. Food Town Stores, Inc.,* 539 F.2d 1339, 1344–45 (4th Cir.1976) (likelihood of success demonstrated by showing that market concentration would increase substantially).

■ Once this presumption is established, the burden of producing evidence to rebut the presumption shifts to the defendants. *See United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 613, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974). *See, e.g., Cardinal Health,* 12 F.Supp.2d at 54; *Staples,* 970 F.Supp. at 1083. To meet this burden, the defendants must show that the

market-share statistics "give an inaccurate prediction of the proposed acquisition's probable effect on competition." *Staples,* 970 F.Supp. at 1083 (citing *United States v. Baker Hughes, Inc.,* 908 F.2d 981, 991 (D.C.Cir.1990)); *see also Cardinal Health,* 12 F.Supp.2d at 54 (quoting *Staples,* 970 F.Supp. at 1083). As stated by the Supreme Court:

> Statistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power; but only a further examination of the particular market—its structure, history, and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger.

*Brown Shoe,* 370 U.S. at 322 n. 38, 82 S.Ct. 1502.

Swedish Match and National attempt to rebut the FTC's prima facie case first by arguing that there will be ongoing significant disincentives to a price increase after the acquisition. Demand for loose leaf tobacco has been declining steadily and is expected to continue to decline in the future. According to the defendants, this decline in demand has fueled fierce price competition because loose leaf producers must compete for new users, and it has created excess capacity at all of the major loose leaf producers' manufacturing plants. Excess capacity will continue to grow with the ongoing decline in loose leaf demand. An incentive to increase sales by reducing prices and promoting product will therefore be sustained after the acquisition. The defendants also point to increased regulation of the sale of tobacco, which has significantly limited the shelf space available to loose leaf. All of this, according to

---

tion, an increase in the HHI is excess of 50 points in a post-merger highly concentrated market may raise significant competitive concerns. In cases where the post-merger HHI is less than 1,800, but greater than 1,000, the Merger Guidelines presume that a 100 point increase in the HHI is evidence that the merger will create or enhance market power.

**12.** The Merger Guidelines are not binding on the Court, but as this Circuit has stated, they do provide "a useful illustration of the application of the HHI." *Id.* at 1503 n. 4.

the defendants, has been, and will continue to be, a catalyst for price competition within the loose leaf market.

The defendants correctly describe the declining demand in loose leaf and the excess capacity of producers resulting from such decline. Consumption declined by two to three percent annually in the early 1990s, by four to five percent annually in the later 1990s, and by 3.3% in 1999. Loose leaf production facilities consequently are operating at below full capacity. While Swedish Match's Owensboro facility has the capacity to produce 33 million pounds of loose leaf tobacco per year, it produced only 18.8 million pounds of tobacco in 1999. Similarly, National's Louisville plant has the capacity to produce 13.7 million pounds of loose leaf per year, but only produced 7.8 million pounds in 1999. The defendants are also correct that these characteristics are endemic to the loose leaf industry and will remain whether the acquisition is allowed to proceed or not.

However, the defendants have failed to explain why consistently wide margins and a steady incline in loose leaf prices have survived in this allegedly fiercely competitive environment. Economic theory suggests that falling demand and excess capacity in a competitive market places downward pressure on prices. Yet prices of loose leaf tobacco have risen steadily over the years and already-wide margins have been maintained. *See, e.g.,* PX 349. The defendants' evidence has not convinced the Court that eliminating one of the top three competitors in this current environment by refusing to enjoin this merger will not exacerbate the anticompetitive behavior already exhibited within the market, especially in light of the market share and concentration evidence. In the current loose leaf tobacco market, the ex-

isting few loose leaf producers monitor one another's prices, generally follow Swedish Match's price increases, have high margins and profits, and do not reduce their prices to stem declining demand.[13] This oligopolistic behavior would not be possible if competition was as fierce as the defendants contend. Rather, this pattern of anticompetitive behavior stems from high concentration in the market, and the defendants have not adequately demonstrated that competition will be facilitated by increasing that concentration.

The defendants next contend that any competition surrendered by the acquisition will be replaced by its current rivals. The defendants specifically claim that Conwood and Swisher will replace any competition lost by the acquisition of National's brands and prevent Swedish Match from unilaterally increases prices. Conwood's Levi Garrett brand of loose leaf tobacco has been and will remain a fierce competitor of Swedish Match's Red Man, because it is has been promoted at nearly the same times and the same levels as National's Beech–Nut brand. Moreover, Conwood and Swisher will have the incentive and excess capacity to produce private label brands, such as Red Leaf for Food Lion stores. Distributors believe that the acquisition will have no effect on competition among loose leaf producers. National believes its competitive influence on price has been relatively ineffective in recent years and will continue to erode if there is no acquisition. UST's influence on constraining loose leaf price increases is important because it specifically targets loose leaf consumers and recently considered entering the loose leaf market. Finally, other loose leaf competitors will be able to defeat any post-acquisition price increase by repositioning their brands—that is, by intro-

13. All of this results in coordinated pricing. The defendants' own expert, Dr. Wu, has testified that these margins are set by taking account of the reactions of rivals—that is, by coordinating prices out of fear of retaliation for price cuts. Swedish Match has typically taken the lead in increasing prices of loose, with the other loose leaf producers following its lead, a pattern which has prevailed since at least 1996. For these reasons, the merger will only increase the likelihood of coordinated action because it creates a duopoly, the monitoring of prices is easy, and firms can punish price cutters.

ducing new brands, expanding existing brands, increasing promotion and advertising of existing brands, and discounting further existing. In 1998, several loose leaf producers introduced new subpremium brands that successfully competed for market share. Swedish Match introduced Southern Pride, Conwood introduced Levi Garrett Extra, and National introduced Durango. By 1999, these brands collectively gained a five percent share of the loose leaf market.

The Court does not find the defendants' evidence sufficient to demonstrate the ability of other loose leaf producers to fill the competitive void that will result if Swedish Match is permitted to acquire National's brands. Rather, the weight of the evidence demonstrates that a unilateral price increase by Swedish Match is likely after the acquisition because it will eliminate one of Swedish Match's primary direct competitors. National's Beech–Nut is the third largest selling loose leaf brand and has a retail price that has consistently played a role in constraining the price of Red Man. As one Swedish Match document acknowledges, "Beech Nut regular is Red Man's prime competitor above the Mason Dixon line and Levi Garrett is the primary competition in the South." Swedish Match's 1999 budget review confirms the importance of the competition that does exist as a price constraint:

> We are at a cross-roads, having lost 5.6 to 6.0 million lbs, 5.9 share points, and over 10 million dollars in operating income in just two years. Essentially, the category has taken a price reduction which is threatening to erode the strength of our brands. We are being forced to compete on price and to reinforce our brand imagery so that we can close the price gap between our brands and the competition yet continue to command a premium price. If we do not, we will continue to lose market strength and income.

The Commission's expert, Dr. Simpson, elaborated on why Swedish Match will most likely find it profitable to exercise a unilateral price increase for Red Man if the merger is allowed. Two factors are of particular concern in determining this likelihood. First, the price-cost margin for National is important because it determines the profit that will be retained by Swedish Match by users who switch from Swedish Match's brands to National's brands (because, of course, Swedish Match will be acquiring National's brands as a result of the acquisition). Second, the diversion ratio is important because it calculates the percentage of lost sales that go to National. High margins and high diversion ratios support large price increases, a tenet endorsed by most economists. Economic theory therefore suggests that Swedish Match will raise prices as long as the profit gained by the higher prices of Swedish Match products in addition to the profit diverted to National's brands is greater than the profit lost through diversion to non-Swedish Match brands. Swedish Match and National have margins ranging approximately from fifty-five percent to sixty-five percent. And based upon market research, approximately twenty-five percent of Swedish Match sales would be lost to National if Swedish Match raised its prices, and forty percent of National sales would be lost to Swedish Match if National raised its prices. Dr. Simpson has estimated that the merger will result in a price increase of Swedish Match's loose leaf brands of approximately eleven percent and a price increase for National's brands of approximately twenty-one percent. Moreover, based upon 1999 sales data, that means that Swedish Match's customers would pay approximately $14.1 million more per year, and National's customers would pay approximately $9.5 million more per year. That totals a $24 million annual anticompetitive effect.

Even assuming the economic theory presented by Dr. Simpson has its faults as indicated in the discussion of the relevant product market above, evidence of the

business realities of the loose leaf market weighs in favor of an injunction. The defendants may be correct that some of the competition currently provided by National, which will be vitiated if the acquisition is permitted, will be replaced by other competition. At some level, as detailed above in defining the relevant product market, moist snuff competes with loose leaf tobacco, a phenomenon in part exemplified by dual usage and UST's ability to attract new and current loose leaf consumers to moist snuff tobacco. However, the evidence proffered by the defendants is insufficient to make a specific finding that such competition will defeat a likely anti-competitive price increase in a post-acquisition loose leaf market. Moreover, strong brand loyalty, legal restrictions on advertising, and shrinking shelf space all make it highly unlikely that current loose leaf competitors could introduce new brands, reposition existing brands, or reduce prices as contended by the defendants. And the defendants have been unable to substantiate their projections of new brand competition by introducing any historical evidence to this effect. In fact, newly introduced loose leaf brands of competitors such as Conwood and Swisher have had marginal success at obtaining market share and at best a nominal effect on constraining the prices of existing brands of loose leaf. The Court therefore agrees with the Commission that the elimination of National from the existing list of loose leaf competitors will only exacerbate the anticompetitive effects of the acquisition.

The Court must also consider whether "entry into the ... market would likely avert anticompetitive effects" of the acquisition. *Baker Hughes, Inc.*, 908 F.2d at 987. "The existence and significance of barriers to entry are frequently, of course, crucial considerations in a rebuttal analysis ... [because] [i]n the absence of significant barriers, a company probably cannot maintain supra-competitive pricing for any length of time." *Id.* at 989. If the defendants can show that the Commission's market-share and concentration statistics give an incorrect prediction of the proposed acquisition's probable effect on competition because entry into the market would likely avert any anti-competitive effect by acting as a constraint on loose leaf prices, the Court will deny the injunction. The Court, however, cannot make such a finding in this case. The defendants have argued that tobacco distributors and retail chains will continue to threaten entry through the introduction of private label brands such as Red Leaf, which is a successful label owned by the Food Lion supermarket chain. They also claim that UST constitutes a viable threat of entry, as demonstrated by a 1997 UST marketing plan that contemplates UST's entry into the loose leaf business. During Mr. McClure's deposition testimony, he testified that during his tenure at Swedish Match he heard rumors about UST's potential to enter the market, which "kept [him] awake at night." UST allegedly could effectuate this threat of entry because it could enter without constructing a new manufacturing plant. It could convert a portion of its existing manufacturing capacity from moist snuff to loose leaf and use the same distribution system for both types of tobacco.

The defendants' evidence on entry, however, is not sufficiently persuasive. As discussed above, the evidence shows falling sales volume, increased government regulation, shrinking shelf space, and brand loyalty, all of which will prevent new entry into this market. Demand in the loose leaf market has been declining at a rate of two to three percent per year, a trend which is expected to continue. Thus, there are fewer sales opportunities for new entrants. The steady decline in loose leaf demand has created excess capacity at loose leaf production facilities, and existing loose leaf producers could simply increase production as an effective competitive response to new entrants. Loose leaf consumers are brand loyal, and regulatory restrictions have decreased the producers' ability to advertise their products. New entrants

therefore would have a significant, uphill climb to take away market share from the incumbent producers. National has admitted as much in a 1997 SEC filing:

> The company believes that the smoke-less tobacco market, including loose leaf chewing tobacco, and the RYO [roll your own] cigarette paper industry are each characterized by non-cyclical demand, brand loyalty, significant barriers to entry, minimal capital expenditure requirements, high profit margins, consistent price increases at the wholesale level as well as the ability to generate strong and consistent free cash flows.

PX 126 at 10.[14] The evidence also shows substantial sunk costs in plant construction, product development, and marketing. Swedish Match spent approximately $25 million to construct its plant in 1973 and estimates its replacement cost at $70 million today. National estimates its replacement cost at $20–25 million. Conwood estimates a new loose leaf manufacturing plant would cost around $20 million. The defendants also spend approximately $18 million each year on is sales force and approximately $5–7 million annually on brand promotion. Competitors such as Conwood spend approximately $15–20 for a brand that has gained a two to three percent market share and is only marginally profitable. New entrants therefore face a significant disincentive because of high costs and little hope of gaining market share. And while the defendants may be correct that UST, at least, can avoid many of these costs as an existing smoke-less tobacco producer, history does not support its viability as a threat. UST had a loose leaf product, but it was unsuccessful. Since then, UST has refused to re-enter the loose leaf market.

Even assuming the defendants are correct about the threat of entry from private label brands and product repositioning, the evidence shows that brand loyalty would largely defeat such efforts. New brands face the same barriers to market entry as new entrants. No historical evidence of new brand introduction has demonstrated success in restraining prices. In fact, the evidence shows that brands introduced by competitors such Conwood and Swisher have had at best marginal success and nominal effect on constraining the prices of existing brands of loose leaf. *See, e.g.,* PX 313.

### 4. Efficiencies

■ It is unclear whether a defense showing that the intended merger would create significant efficiencies in the relevant market, thereby offsetting any anti-competitive effects, may be used by a defendant to rebut the government's prima facie case. As recently stated by the D.C. Circuit, "[t]his is a novel defense, which the Supreme Court has not addressed since the 1960s (and then, unfavorably) . . . which this court has never addressed, and as to which the antitrust enforcement agencies have only recently clarified their views." *FTC v. Heinz, H.J. Co.,* No. 00–5362, 2000 WL 1741320, at *2 (D.C.Cir. Nov. 8, 2000) (citations omitted); *see also Staples,* 970 F.Supp. at 1088–89. Even assuming that it is a viable defense in some cases, however, the Court finds that the defense is inappropriate in this particular case, in which the acquisition would generate undue market share and increased concentration as discussed above. *Cf. Heinz, H.J. Co.* (citing Phillip E. Areeda et al., Antitrust Law § 971f (1998) (supporting efficiencies defense but requiring "extraordinary" efficiencies where the "HHI is well above 1800 and the HHI increase is well above 100"); Merger Guidelines § 4 (stating that "[e]fficiencies almost never justify a merger to monopoly or nearmonopoly")).

■ Moreover, even if the defense could be appropriately applied here, the Court ultimately finds that the defendants' efficiencies evidence is insufficient to rebut the presumption that the merger may sub-

14. [Redacted]

stantially lessen competition. Swedish Match and National contend that the merger will produce substantial procompetitive efficiencies. Lower fixed costs will be realized through the use of Swedish Match's Owensboro plant's excess capacity by consolidating National's brands with Swedish Match's brands. Dr. Wu estimated fixed cost savings at $4.1 million per year. Lower variable costs will result from labor cost savings due to a higher degree of automation at the Owensboro plant, distribution savings, and raw material cost savings due to greater volume purchasing. Dr. Wu estimated these savings at approximately $1.4 million annually. These savings allegedly will be passed on to consumers. Dr. Wu stated in his report that the variable cost savings will likely be passed on to consumers because the lower costs will provide more incentive to increase sales, which is usually accomplished by reducing prices.

However, the defendants' evidence on efficiencies is not sufficient to overcome the presumption of illegality in this case. The savings that will be passed on to the consumers in the form of lower prices in this case is at best speculative. Dr. Wu stated in his deposition that if fixed costs were to be passed on, it would only happen in the distant future. While admitting that they will not pass on 100% of the savings to consumers, the defendants have not detailed what proportion they will pass on and how that will defeat the likely price increases in this market. In fact, Swedish Match's own financial projections with respect to this acquisition assume an annual price increase of five cents per pouch on National's brands. Without significantly more evidence to substantiate the savings purported in this case, and without greater clarity on the state of antitrust law in this circuit, the defendants are unable to rebut the presumption here with an efficiencies defense.

## B. Equities

Having found that the Commission has established a likelihood of success on the merits, a presumption in favor of a preliminary injunction arises. *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1507 (D.C.Cir.1986); *FTC v. Alliant Techsystems Inc.*, 808 F.Supp. 9, 22–23 (D.D.C. 1992). Despite this presumption, however, the Court must still turn to and consider the equities. The D.C. Circuit has held that in these cases, the Court is obligated "to exercise independent judgment on the propriety of issuance of a temporary restraining order or preliminary injunction." *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1082 (D.C.Cir.1981) (quoting H.R.Rep. No. 624 at 31). "Independent judgment is not exercised when a court responds automatically to the agency's threshold showings. To exercise such judgment, the court must take genuine account of 'the equities.'" *Id.*

There are two types of equities which the Court must consider in all Section 13(b) cases, private equities and public equities. In this case, the private equities include the corporate interests of Swedish Match and National. The public equities are the interests of the public, either in having the merger go through or in preventing the merger. An analysis of the equities includes the potential benefits, both public and private, that may be lost by enjoining a merger. *See id.* at 1083. In addition, the Court notes that in balancing the equities, it is important to keep in mind that while private equities are important, "[w]hen the Commission demonstrates a likelihood of ultimate success, a counter showing of private equities alone would not suffice to justify denial of a preliminary injunction barring the merger." *Id.* at 1083.

The defendants argue that granting an injunction in this case will not only hurt the private corporate interests of Swedish Match and National, but will defeat substantial cost savings that will be passed on to consumers. Loose leaf producers are forced to compete with rising rates of excess capacity and falling demand. Swedish Match and National believe that the

consolidation of National's brands into Swedish Match's production will engender greater efficiency, making the companies and the loose leaf industry more competitive. In turn, the public will benefit from the realized efficiencies because cost savings will be passed on in the form of lower prices. Thus, an injunction will harm the public because it will defeat the efficiencies and greater price competition.

However, the public equities advanced by the Commission outweigh the equities advanced by the defendants. There is a strong public interest in effective enforcement of the antitrust laws that weighs heavily in favor of an injunction in this case. And having already rejected the defendants' arguments that the acquisition will result in greater competition, the Court does not find the restatement of that position here persuasive. In addition, an injunction is needed to provide interim protection of competition while the case proceeds to a full administrative hearing before the Commission on the merits of whether this acquisition violates Section 7 of the Clayton Act. Without an injunction, National will be eliminated as a competitor, allowing Swedish Match even greater control of the market, and as stated earlier, competition is likely to be impaired as a result. The absence of an injunction will also make it impossible to accomplish full relief should the Commission subsequently determine after a full administrative hearing that this acquisition does violation Section 7 of the Clayton Act. National's brands will be integrated into the operations of Swedish Match in a manner that will prevent National from being reconstituted in its current state as a viable competitor to Swedish Match. In other words, the eggs will be irreparably scrambled when National's loose leaf brands are eliminated from loose leaf market and National converts its loose leaf production into cigarette tobacco production, which requires different equipment and a different production line. The Court has considered alternative relief such as a hold separate order, but finds that it would be unwar-

ranted under the circumstances of this case. The public equities proffered by the defendants that efficiencies will result if the acquisition is allowed are necessarily predicated upon the consolidation of National's brands into Swedish Match's loose leaf production facility. A hold separate order, therefore, would vitiate the very basis for refusing to grant the injunction. After weighing the public and private equities in this case, the Court finds that the equities at issue in this case tip the balance in favor of an injunction.

## III. CONCLUSION

For the reasons stated above, the Court finds that the Commission has shown a "reasonable probability" that the proposed acquisition by Swedish Match of National's brands will substantially impair competition and has "raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instances and ultimately by the Court of Appeals." Therefore, the Court finds that the Commission has shown a likelihood that it will succeed in proving, after a full administrative trial on the merits, that the effect of the proposed acquisition by Swedish Match "may be substantially to lessen competition" in violation of Section 7 of the Clayton Act. In addition, the Court has weighed the equities and finds that they tip in favor of granting a preliminary injunction. A preliminary injunction is, therefore, found to be in the public interest. The FTC's motion for a preliminary injunction shall be granted.

An appropriate order accompanies this Memorandum Opinion.

### *ORDER*

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Federal Trade Commission's motion for preliminary in-

junction is **GRANTED.** Accordingly, it is further

**ORDERED** that defendants Swedish Match North America Inc., and National Tobacco Company, L.P., their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them, are hereby re-strained and enjoined from any further performance of the February 10, 2000 as-set purchase agreement, pending conclusion of administrative proceedings before the Federal Trade Commission or further order of this Court.